UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X
UNITED STATES OF AMERICA             :

      v.                                                     :        **AFFIRMATION**
                                                                                             **20 Cr. 133 (JSR)**

**FREDERICK SCHEININ**,                      :

            Defendant.                          :
------------------------------------------------------X

       I, Sylvie Levine, hereby affirm under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:

1. I am an Assistant Federal Defender with the Federal Defenders of New York, court-appointed counsel to Frederick Scheinin in this case.  The Federal Defenders, by Tamara Giwa, Esq., represented Mr. Scheinin from his presentment through his jury trial held before this Court from June 16 through June 22, 2021.  Undersigned counsel joined Ms. Giwa as co-counsel for Mr. Scheinin's trial.

2. I make this affirmation in support of our motion requesting that the Court conduct an <u>in camera</u> review of all records from MDC Brooklyn surrounding the death of Frederick Scheinin in the Special Housing Unit (SHU) at MDC less than 24 hours after he was remanded by the Court.

3. All statements herein are made upon information and belief, unless otherwise indicated.  I have not included all of the details from all statements made to me.  All recitations are made to the best of my recollection.

4. Undersigned counsel and government counsel spoke to the Court by phone on Wednesday, June 23, 2021, and Friday, June 25, 2021.  During those conversations, the Court relayed to the parties the information that MDC and BOP had supplied the Court.  The Court invited counsel to follow up if we learned information that was different or contrary to that information.

5. I have spoken to other members of Mr. Scheinin's defense team, a member of Mr. Scheinin's family, an attorney ("Attorney-1")[1] that represents a client ("Client-1") who was in SHU the night that Mr. Scheinin died, and two people who were incarcerated in the cells closest to Mr. Scheinin ("Client-2," whom I spoke to directly, and "Client-3," whose account I heard through a third party). Our inquiry remains ongoing.

---

[1] All parties asked that we refer to them anonymously, for fear of potential retribution by BOP staff.

1

6. I have learned the following information about what occurred following Mr. Scheinin's remand on June 22, 2021:

   a. Mr. Scheinin was remanded at approximately 12:30 p.m. on June 22, 2021. He was processed by the Marshals at 500 Pearl and brought to MDC Brooklyn at some point.[2] The Court signed a medical Order, ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆. The Order was immediately served on the Marshals and the BOP, including the legal staff for both MDC and MCC.

   b. At MDC Brooklyn, Mr. Scheinin was taken through the intake process. ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

   c. The MDC Warden told the Court that MDC did not have the benefit of Mr. Scheinin's records from his prior detention at MCC. Of course, both facilities are run by the BOP, the records are kept electronically on a nationwide medical records system, and the two facilities regularly share information (indeed, their legal departments are supervised by a single person: Nicole McFarland). It remains unclear why the BOP could not – or did not – access its own records to learn about Mr. Scheinin's history in its care.

   d. Not long before the 9:30 p.m. count, Mr. Scheinin was brought to MDC's SHU and placed in Cell ▆▆▆.[3] He was alone in the cell and had no cellmate. The MDC SHU cells on that tier each have solid metal doors with a clear window. The SHU hallway has cameras, but the individual cells do not.

7. Client-2 reported that as of July 3, no one has interviewed him about Mr. Scheinin's death or the night that Mr. Scheinin died, except his attorney and undersigned counsel. He has not seen anyone come to the tier to investigate other than SIS; he has not seen the Warden, the FBI, OIG, the legal department, or any employees of the U.S. Attorney's Office come to the unit to investigate.[4]

---

[2] The Warden told Your Honor that the MDC was chosen over MCC because MDC was better equipped to deal with "special protections," including having more experience housing cooperators. That statement stands in stark contrast to the Federal Defenders' collective experience. Not only are our office's cooperators held at both facilities (and, often, in contracted prisons like GEO in Queens, or Essex County Correctional Facility in New Jersey), the MCC has two levels of Special Housing Units (SHUs): 9-South and 10-South (the latter of which houses clients with Special Administrative Measures (SAMs), and other special categories of inmates).

[3] We alternatively heard this cell referred to as "▆▆," i.e. without the first digit. (Similarly, cells ▆▆▆▆▆▆ (described below) were alternatively referred to as ▆▆▆▆▆▆.")

[4] This stands in stark contrast to the inquiry launched when Jeffrey Epstein died at MCC New York. As was widely reported, the Attorney General of the United States toured the facility, along with attorneys from the United States Attorney's Office for the Southern District of New

8.  During our inquiry, the following inconsistencies and questions have been raised, including regarding the accuracy of the BOP's original recitation to the Court:

The timeline of Mr. Scheinin's death provided by MDC is inconsistent

9.  The Warden stated to the Court that staff rounds were conducted at 4:30 a.m., at which time Mr. Scheinin was cold and awake. At 5 a.m. – at the next staff round – Mr. Scheinin was dead.

10. The Associate Warden told Mr. Scheinin's family that at staff rounds at 6:00 a.m., Mr. Scheinin was sitting on his bed with a blanket over his shoulders. According to the Associate Warden, 30 minutes later, at the 6:30 a.m. rounds, he was dead.

11. Client-2 and Client-3 reported that when the officers entered Mr. Scheinin's cell, a team of five officers did so together. The Lieutenant initially ordered that Mr. Scheinin be handcuffed. Mr. Scheinin subsequently was brought out on a stretcher.

12. The Medical Examiner's (ME) Office told Mr. Scheinin's family ███████████████████████████████████████████████████████████████████████

Demands for medical attention in the SHU went unheeded all night on June 22-23, 2021

13. Client-2 and Client-3, who were housed on either side of Mr. Scheinin's cell, heard Mr. Scheinin ask for medical attention when he was brought into his SHU cell at approximately 9pm. Client-1 heard from other SHU residents that Mr. Scheinin repeatedly rang his bell for medical attention.

14. On June 22, 2021, for hours before and after Mr. Scheinin arrived, other SHU residents were begging for medical attention. The "medical emergency" buttons in the SHU cells were not working. Thus, to alert the MDC staff to a medical emergency, the residents banged on their cell doors to demand attention. On the evening of June 22-23, two residents – in Cell ███████████ – were having medical emergencies: ███████████████████████████████████████████████████████████ The MDC staff in SHU claimed to the residents that they had called the medical team, but had received no response. The SHU residents continued to bang on their cell doors in an effort to convince the MDC staff that the problem was serious.

15. In an effort to escalate their demands for medical attention, some people on the tier covered the windows of their cells (Client-1 heard from another person on the tier that Mr. Scheinin was one of them). This is done in order to bring a response from staff, because window covering is a violation of the institution's rules. The window coverings did not prompt any actions by the BOP staff that night and the coverings remained up for

---

York, as part of a widespread investigation. Criminal charges were subsequently filed against two MCC guards.

3

many hours that night.  As a further escalation, after the midnight count, one resident (of either Cell ▮▮▮▮▮▮), flooded the entire hallway of the tier with water.

16. Despite these efforts, Client-1, Client-2, and Client-3 reported that no medical personnel came to the tier and no medical care was provided.

17. After Mr. Scheinin died, SIS Tech Fields came and took photographs of his cell, likely including the flooded hallway.

The cause of Mr. Scheinin's death remains unknown

18. On the date of Mr. Scheinin's death, the MDC wrote letters to defense counsel informing us that Mr. Scheinin had died ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"[5]

19. The Medical Examiner's Office encouraged Mr. Scheinin's family to allow them to perform an autopsy, given the suspicious nature of the death.  His family agreed. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  The final results of the autopsy have not been received by the family.

20. The Associate Warden told Mr. Scheinin's family that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  The ME took pictures of them.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

21. Mr. Scheinin's family was recently issued a temporary death certificate, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮."

**WHEREFORE**, it is respectfully requested that this Court enter an Order granting the motion for an in camera inspection of BOP documentation, and granting such further relief as this Court deems just and proper.

Dated:     New York, New York
           July 16, 2021

                                        /s/_____
                                        **SYLVIE LEVINE**

---

[5] Again, this stands in stark contrast to the BOP immediately advising that Jeffrey Epstein's death was an "apparent suicide" in its notification regarding his death to Judge Berman.  See United States v. Epstein, 19 Cr. 490 (RMB), Dkt. No. 44.